UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In Re:                                              Chapter 15

MIRROR TRADING INTERNATIONAL                        Case No.: 23−11046−PDR
(PTY) LTD,

Debtor in a Foreign Proceeding
_____/
                                                    Adv. Pro. No. 24-_____ (PDR)

CHAVONNES BADENHORST ST CLAIR
COOPER, in her capacity as the Foreign
Representative of Mirror Trading
International (PTY) Ltd,

Plaintiff,

v.

NAUDAAN SUACHAII HURH,

Defendant.

_____/

## ADVERSARY COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS PURSUANT TO SOUTH AFRICAN LAW

Chavonnes Badenhorst St Clair Cooper (the "Liquidator") as one of the duly appointed liquidators of the bankruptcy estate of Mirror Trading International (PTY) Ltd (the "Foreign Representative" or "Plaintiff") files this Complaint in the above-captioned action against defendant NAUDAAN SUACHAII HURH ("Defendant") and alleges as follows:

1

## NATURE OF THE ACTION

1.     This action seeks to recover ill-gotten purported investment gains monies paid to Defendant as a result of the fraudulent and illegal pyramid scheme orchestrated and perpetuated by the above-captioned Debtor ("Debtor" or "MTI") over the course of two years in South Africa, from which Defendant benefitted.

2.     The Debtor purportedly was a fund manager trading in cryptocurrency, particularly bitcoin. However, as described in detail in the factual background, an investigation by the South African Financial Sector Conduct Authority ("FSCA") into the Debtor revealed the Debtor was merely a vehicle utilized by the Debtor's sole director and chief executive officer to perpetrate a massive pyramid investment scheme involving investors from over 234 global jurisdictions

3.     The Debtor operated by soliciting members of the public to invest their funds in the form of bitcoin on online derivative trading platforms through the Debtor, on the promise of unrealistically high returns, i.e. up to 10% per month.

4.     The Debtor directed investors to transfer the investors bitcoin to one of the Debtor's e-wallets ("MTI Investor"). After the MTI Investor deposited his/her bitcoin with the Debtor ("Bitcoin Contribution"), the Debtor then purportedly transferred the MTI Investors' Bitcoin Contribution to a "pooled account" in the name of the Debtor held with the derivative trading platforms. The Debtor provided "trading statements" to the MTI Investors showing profitable trades on behalf of the pooled account investments.

5.     The Debtor's business model made use of a referral structure in terms of which existing investors received referral bonuses, over and above their exorbitant returns on investment, for the recruitment of new members to "invest" their bitcoin through the Debtor.

SEQUOR LAW, P.A.

6.     Investigations conducted by the FSCA and the Liquidators indicate that the Debtor utilized the funds invested by the MTI Investors to cover the Debtor's operational costs, the returns on investment, and the referral bonuses of the MTI Investors.

7.     Based upon records obtained by the FSCA and the Liquidators, certain MTI Investors benefited from the Debtor's fraudulent pyramid investment scheme in that they received additional dispositions from the Debtor in excess of the amount of their Bitcoin Contributions, in the form of investment gains and/or referral bonuses.

8.     Accordingly, this  adversary proceeding (the "Adversary Proceeding") is brought pursuant to, *inter alia*, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), section 1521(a)(7) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), *In re Condor Ins. Ltd.*, 601 F.3d 319 (5th Cir. 2010), and sections 26, 29, 30, and 32 of the Insolvency Act, 24 of 1936 of the Republic of South Africa (the "SA Insolvency Act"), seeking a judgment:

(a)    avoiding and recovering  dispositions without value of the Debtor to, or for the benefit of, Defendant in, at a minimum, the amount set forth in **Exhibit A**, pursuant to SA Insolvency Act §§ 26 and 32;

(b)    avoiding and recovering preferential transfers to Defendant in , at a minimum, the total amount set forth in **Exhibit A**, pursuant to SA Insolvency Act §§ 29, 30 and 32;

(c)    that Plaintiff is entitled to recover from Defendant reasonable attorneys' fees, expenses, and costs of collection incurred in the prosecution of this Adversary Proceeding; and

(d)    granting such other and further relief as the Court deems just and equitable.

## <u>JURISDICTION</u>

9.     This is a proceeding arising under or relating to the petition for recognition of foreign proceeding by the Debtor under chapter 15 of the Bankruptcy Code.  As a result, this Court

3

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and Bankruptcy Rule 7001.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1410.

11.     This Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

## PARTIES

12.     Plaintiff is the Foreign Representative of the Debtor, as recognized by Order of this Court on March 18, 2023 ("Recognition Order"). Pursuant to the Recognition Order, the Foreign Representative is entrusted with the full administration and realization of all or a part of the Debtor's bankruptcy estate and assets within the territorial jurisdiction of the United States.

13.     Defendant has been identified as an MTI Investor that received distributions from the Debtor in excess of Defendant's contribution.

## FACTUAL BACKGROUND

I.     **THE DEBTOR'S FORMATION AND BUSINESS MODEL.**

14.     MTI was founded by its sole registered director and chief executive officer, Cornelius Johann Steynberg ("Steynberg"), in the Republic of South Africa in April 2019.

15.     MTI's website described the nature of MTI's business as "an internet based crypto-currency club which performs its business through the website www.mymticlub.com and its official offices in Stellenbosch, Western Cape, South Africa. The benefit to members is in the form of the crypto-currency bitcoin where members' bitcoin grows through forex trading by a registered and regulated broker."

4

16.     The MTI website contained an electronic document which purportedly served to regulate the contractual relationship between MTI and its investors (the "MTI Agreement"). MTI Investors were referred to as "members" of the MTI investors club, "My MTI Club".

17.     The MTI Agreement provided for, inter alia, the following terms and conditions:

(a) Upon accessing and registering on the MTI website and/or by using any MTI services, a member agreed that he/she has read, understood and agreed to and undertook to abide by the terms of the MTI agreement.

(b) The marketing of MTI's business was based on a multi-level marketing strategy. In addition to receiving a share of trading profits, members also received a variety of incentive-based renumerations, based on the referral of new members who also joined MTI and made an investment.

(c) The proceeds derived from trading profits to which members were entitled were regulated by the MTI compensation plan, which consisted of five income streams described as:

i.   40% members daily trading bonus;

ii.  10% direct once-off referral bonus;

iii. 20% weekly profit-sharing bonus;

iv.  2.5% P1 leadership bonus;

v.   2.5% P2 leadership bonus.

(d) All of the income streams would be paid from the daily profits made by MTI through its trading activities and not from any of the bitcoin invested by the investors.

5

18.    To participate, MTI Investors would first transfer their bitcoin from their own wallets to a wallet controlled by MTI (and likely held in the name of Steynberg) (the "Pooled Account"). Then, MTI in its name, transferred the bitcoin from the Pooled Account to brokers who held it in an account in the name of MTI. The MTI Investors would share in the profits and losses of MTI.

19.    MTI's business model was summarized in an online presentation and used to attract new investors, on the promise of unrealistically high returns, i.e. up to 10% per month. The business model also made use of a referral structure, where the investors received referral bonuses, above and beyond their exorbitant returns on investment, for the recruitment of new members willing to "invest" their bitcoin through MTI. By way of example, investigation into the Debtor revealed that more than 3,500 bitcoin was paid to approximately 180 individuals as referral bonuses. At the current value of one bitcoin (USD $ 57,000), this equates to approximately USD $ 199,297,700.00, or USD $199 million.

20.    MTI provided "trading statements" to the investors showing profitable trades on behalf of the Pooled Account. It was later verified that such "trading statements" did not reflect any investments made through the Pooled Account but were in fact statements from a simulated demo account that never made any actual investments. MTI did not disclose that the "trading statements" did not in fact reflect the investments made through and for the Pooled Account.

21.    The lifespan of MTI's operation can be analyzed in three periods.

   (a) <u>April 2019 to July 2019</u> ("Period 1"): MTI clients linked sub-accounts on the FXChoice platform, trading in forex, during which a human trader's trades were mirrored onto each investor's sub-account (the "MAM Accounts"). Period 1

preceded the launch of MTI's website and the implementation of the MTI Agreement.

(b) <u>August 2019 to October 2020</u> ("Period 2"): MTI launched its website and implemented the MTI Agreement. During Period 2, MTI recruited investors, with the invested bitcoin purportedly being utilized for forex trading in the name of MTI via FXChoice platform, and under the exclusive supervision of Steynberg. Steynberg alleged that the trading during Period 2 was done profitably by utilizing an artificial intelligence bot, and that MTI only had a single negative day of trading during Period 2.

(c) <u>October 2020 to December 2020</u> ("Period 3"): Steynberg alleged that during Period 3, he transferred all the bitcoin in the MTI pool of members' bitcoin from FXChoice to the unregulated broker, Trade 300.

22.    Steynberg went missing on or about December 14, 2020 while MTI was still purportedly processing withdrawal requests from MTI Investors. The 16,000 pending withdrawal requests amounted to approximately 2,600 bitcoin and were never effected.

23.    Steynberg was arrested in December 2021 in Brazil.

## II.    THE DEBTOR'S ACTIVITIES PROMPT INVESTIGATION BY THE SOUTH AFRICAN FINANCIAL SECTOR CONDUCT AUTHORITY.

24.    In 2020, the FSCA launched an investigation into the business of MTI due to an anonymous tip (the "FSCA Investigation"). As part of its investigation, the FSCA interviewed Steynberg and other various high-level management executives of MTI regarding the Debtor's operations.

25.    Subsequently, on December 17, 2020, the FSCA issued a press release stating, among other things, that:

(a) The FSCA found evidence contradicting the Debtor's alleged returns of investment of 10% per month when it had suffered a capita loss of approximately 30% in a certain period;

(b) The FSCA found evidence contradicting the Debtor's statements regarding the derivative trading platforms the Debtor utilized, the transfer of funds between platforms, and the volume of trading in a much lower rate than the one informed; and

(c) The FSCA found evidence that the new derivative trading platform the Debtor informed it was using was not a legitimate platform but was in fact linked to Steynberg himself.

## III.    THE DEBTOR'S RESPONSE TO THE INVESTIGATION AND SUBSEQUENT LIQUIDATION PROCEEDING.

26.    Following the commencement of the FSCA Investigation, MTI, Steynberg and the management team of MTI made certain representations to the MTI Investors, and the FSCA, through social media, website notices, and YouTube clips regarding the future of MTI. Specifically, MTI and management relayed to the public at large that:

(a) MTI had moved the entire bitcoin trading pool of MTI from the trader where it was allegedly held (FXChoice), to a new trading platform known as Trade 300, in anticipation of a fear expressed by Steynberg that FXChoice may freeze all the bitcoin held by it pursuant to a cease-and-desist notice MTI had received from the Texas State Security Board;

(b) The new broker, Trade 300, was not a licensed forex trader and was not required to have forex trading licenses being that it was a Nevis registered broker;

8

(c) The bitcoin frozen at that stage in the FXChoice account, amounting to approximately 1282 bitcoin, was not part of MTI Investors' bitcoin, but belonged to MTI and Steynberg;

(d) MTI had moved the bitcoin held by it in the trading pool at FXChoice to Trade 300 in four transfers during the period of July 21, 2020 to July 24, 2020, with the number of bitcoin transferred to Trade 300 being 16,444 bitcoin.

27.     As a consequence of the fraudulent scheme outlined above, the Debtor incurred significant liabilities to thousands of investors. As the investors sought to withdraw their bitcoin balances, the Debtor found itself, unsurprisingly, unable to effectuate the requests to pay the investors.

28.     On December 29, 2020, the High Court of South Africa, Western Cape Division, Cape Town, Republic of South Africa ("South African Court") entered a Provisional Liquidation Order placing the Debtor into an involuntary provisional liquidation in the Republic of South Africa ("Liquidation"). On June 30, 2021, the South African Court entered the Final Liquidation Order placing the Debtor into an involuntary final liquidation. On November 11, 2021, the South African Court issued the Certificate of Appointment of Liquidator, appointing six Joint Liquidators, including the Plaintiff in this Adversary Proceeding.

IV.     THE FSCA REPORT AND INVESTIGATION FINDINGS.

29.     On January 18, 2021, the FSCA Investigation culminated with a report wherein the FSCA concluded that MTI's business was unlawful in a number of respects (the "FSCA Report"). Specifically, the FSCA Report stated that MTI:

(a) operated a massive fraudulent and unlawful investment scheme, in flagrant disregard of various financial sector laws;

9

(b) conducted an illegal, unregistered financial services business in contravention of (at least) section 7 of the Financial Advisory and Intermediary Services Act, 37 of 2002; and

(c) that there could be no other conclusion but that the investments made by investors into MTI and the scheme conducted by it, were misappropriated.

(d) The FSCA Report confirmed that trading did not take place during Period 1, and that limited trading took place during Period 2.

30.    From the information it gathered, the FSCA further concluded that the representations made by MTI, Steynberg and the management team to the MTI Investors (and the FSCA) were false as to the following:

(a) MTI did not move bitcoin from FXChoice during 2020, as MTI's account with FXChoice had been frozen on June 10, 2020 and the bitcoin could not be moved;

(b) Trade 300 did not exist and was fictitious platform created by Steynberg;

(c) The bitcoin frozen by FXChoice was not the property of Steynberg, but belonged to MTI and formed part of the Pooled Account;

(d) The bitcoin deposited by MTI Investors into the Pooled Account were not transferred immediately to any FXChoice trader account, but instead, diverted to accounts under the control of Steynberg and the MTI management and marketing team.

(e) Only a limited number of bitcoin were traded by MTI at FXChoice and MTI experienced an approximate capital loss of 30% during the period of January 2020 to June 3, 2020;

(f) No profits were found on any other trading platform;

10

(g) All daily published reports of daily trading profits were false and reports that MTI Investors' bitcoin grew every day (as a result of trading profits and/or trading bonuses) were false;

(h) All reports that MTI had continuously traded profitably during Period 2 were false;

(i) The report that the bitcoin of MTI, held at FXChoice, were transferred to Trade 300 were false;

(j) All reports that the trading of MTI's bitcoin was effected by a bot with artificial intelligence were false; and

(k) Reports that the bot traded in real time were false.

31.     The FSCA findings, in summary, reflected that contrary to what MTI had been representing to the MTI Investors and the public at large:

(a) MTI never achieved any growth in bitcoin as a result of trading activities;

(b) MTI could therefore never have reflected such growth in bitcoin to MTI Investors as it did daily;

(c) MTI could never, from any *bona fide* trading activities, pay investors who withdrew their bitcoin; and

(d) MTI used bitcoin received from later investors to pay earlier investors.

## V.     FINDINGS AND ORDERS OF THE SOUTH AFRICAN COURT RELATING TO DEBTOR'S OPERATION.

### I.     The Debtor Is Found To Be An Illegal Pyramid Scheme.

32.     On April 26, 2023, the Honorable Judge De Wet of the South African Court handed down a judgment relating to the Debtor's operations in a detailed 53-page order (the "SA Judgment").

SEQUOR LAW, P.A.

33.     In the SA Judgment, the South African Court referenced the FSCA Investigation and subsequent FSCA Report in detail, and made the following findings relevant to the instant Adversary Proceeding:

(a) MTI's business model was an illegal and unlawful scheme.

(b) All agreements concluded between MTI and its investors in respect of the trading/management/investment of bitcoin for the purported benefit of the investors were unlawful and *void ab initio*.

34.     In reaching its conclusions, the South African Court specifically found that the business conducted by MTI contravened provisions of several South African financial statutes, and based on the facts presented in the case, it could not be denied that MTI's underlying business model was "designed and implemented to perpetrate a fraud on members of the public which ultimately enabled its directing mind(s), being its director(s) and/or shareholders and/or senior management, to misappropriate investors assets for their personal gain."

## II.     The South African Court Authorizes the Joint Liquidators To Pursue Claims Against MTI Investors.

35.     In light of the complex and novel nature of the matter, the Liquidators of MTI sought directive from the South African Court concerning the manner in which, *inter alia,* (i) bitcoin should be classified and treated in the insolvent estate of MTI, (ii) how different classes of investors in the MTI bitcoin scheme should be classified, (iii) how the joint liquidators should proceed with claims against such classes of investors and (iv) how claims by investors against the insolvent estate should be dealt with.

36.     In their application to the South African Court, the Liquidators classified the classes of MTI Investors as follows:

(a) <u>Class 1 Investors</u>: individuals who invested in the Scheme, but who did not receive anything—i.e. zero in return.

(b) <u>Class 2 Investors</u>: individuals who invested in the Scheme and who, although having received a return on their investment, received less than what they invested in the Scheme, essentially not profiting from the Scheme;

(c) <u>Class 3 Investors</u>: individuals who invested in the Scheme and who received returns that exceed the amount of capital invested in the Scheme, thereby profiting from being participants in the Scheme ("Profit").

37.     Directly relevant to the instant Adversary Proceeding, was the Liquidators request for directive on how to proceed with estate claims against investors ("Estate Claims"). On November 9, 2023, the Honorable Maher AJ of the South African Court, entered a judgment and order relating to the Joint Liquidators' directives requests, including as to the Estate Claims ("Estate Claim Order").

38.     With regard to the Estate Claims, the South African Court found that the Liquidators were vested with claims against Class 3 Investors premised on (i) Section 26 of the SA Insolvency Act ("Section 26 Claims"); (ii) Section 29 of the SA Insolvency Act (" Section 29 Claims"); and (iii) Section 30 of the SA Insolvency Act (" Section 30 Claims").

39.     Specifically, the South African Court found that the Liquidators could pursue the Class 3 Investors as to the all the transfers made to the Class 3 Investors by the Debtor, including for the Profits, under Sections 26, 29, or 30 of the SA Insolvency Act.

40.     Pursuant to the Recognition Order, the orders and/or findings by the South African Court are applicable in the United States. *See* Recognition Order, ¶ 2.

13

<u>**COUNT ONE**</u>

**RECOVERY OF DISPOSITION OF PROPERTY WITHOUT VALUE PURSUANT TO <u>SECTION 26 OF THE SA INSOLVENCY ACT</u>**

41.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

42.    Defendant has been identified as a Class 3 Investor who received a Profit disposition from the Debtor.

43.    Section 26 of the SA Insolvency Act ("Section 26") provides:

*Section 26—Disposition without value*

*(1) Every disposition of property not made for value may be set aside by the court if such disposition was made by an insolvent—*

> *a.  More than two years before the sequestration of his estate, and it is proved that, immediately after the disposition was made, the liabilities of the insolvent exceeded his assets;*
> *b.  Within two years of the sequestration of his estate, and the person claiming under or benefited by the disposition s unable to prove that, immediately after the disposition was made, the assets of the insolvent exceeded his liabilities:*

*Provided that it is proved that the liabilities of the insolvent at any time after the making of the disposition exceeded his assets by less than the value of the property disposed of it may be set aside only to the extent of such excess.*

*(2) A disposition of property not made for value, which was set aside under subsection (1) or which was uncompleted by the insolvent, shall not give rise to any claim in competition with the creditors of the insolvent's estate: Provided that in the case of a disposition of property not made for value, which was uncompleted by the insolvent, and which—*

> *a.  Was made by way of suretyship, guarantee of indemnity; and*
> *b.  Has not been set aside under subsection (1),*

*the beneficiary concerned may compete with the creditors of the insolvent's estate for an amount not exceeding the amount by which the value of the insolvent's assets exceeded his liabilities immediately before the making of that disposition.*

44.    Section 32 of the SA Insolvency Act ("Section 32") provides:

*Section 32—Proceedings to set aside improper disposition.*

14

> (1)(a) Proceedings to recover the value of property or a right in terms of section 25(4), to set aside any disposition of property under section 26, 29, 30 or 31, or for the recovery of compensation or a penalty under section 31, may be taken by the trustee.
>
> (b) If the trustee fails to take any such proceedings they may be taken by any creditor in the name of the trustee upon his indemnifying the trustee against all costs thereof.
>
> (2) In any such proceedings the insolvent may be compelled to give evidence on a subpoena issued on the application of any party to the proceedings or he may be called by the court to give evidence. When giving such evidence he may not refuse to answer any question on the ground that the answer may tend to incriminate him or on the ground that he is to be tried on a criminal charge and may be prejudiced at such a trial by his answer.
>
> (3) When the Court sets aside any disposition of property under any of the said sections, it shall declare the trustee entitled to recover any property alienated under the said disposition or in default of such property the value thereof at the date of the disposition or at the date on which the disposition is set aside, whichever is higher.

45. Pursuant to the Estate Claims Order, each transfer made to Defendant was not made for value as contemplated in Section 26, in that:

(a) Debtor was not liable to Defendant to dispose of any bitcoin to Defendant in excess of the Defendant's Bitcoin Contribution; and

(b) In disposing of bitcoin in excess of Defendant's Bitcoin Contribution, Debtor made dispositions of the additional bitcoin to Defendant without receiving value therefor.

46. Each of the dispositions of additional bitcoin from Debtor to Defendant were made less than two years before the liquidation of the Debtor.

47. At the time when Debtor made such dispositions to Defendant, Debtor's liabilities already exceeded its assets, and the dispositions of such additional bitcoin to Defendant increased the extent by which the Debtor's liabilities already exceeded its assets.

SEQUOR LAW, P.A.

48.     Accordingly, each disposition of bitcoin to Defendant in excess of Defendant's Bitcoin Contribution should be set aside pursuant to Section 26(1) of the SA Insolvency Act and recoverable by the Plaintiff pursuant to Section 32(3) of the SA Insolvency Act..

49.     Plaintiff seeks a judgment requiring Defendant to return to the Debtor's estate every disposition of additional bitcoin received from the Debtor, in, at a minimum, the amount reflected in the chart attached hereto as **Exhibit A**.

<u>**COUNT TWO**</u>
**RECOVERY OF VOIDABLE PREFERENCE PURSUANT**
<u>**TO SECTION 29 OF THE SA INSOLVENCY ACT**</u>

50.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

51.     Defendant has been identified as a Class 3 Investor who received a Profit disposition from the Debtor.

52.     Section 29 of the SA Insolvency Act ("Section 29") provides:

***Section 29- Voidable preferences***

*Every disposition of his property made by a debtor not more than six months before the sequestration of his estate or, if he is deceased and his estate is insolvent, before his death, which has had the effect of preferring one of his creditors above another, may be set aside by the Court if immediately after the making of such disposition the liabilities of the debtor exceeded the value of his assets, unless the person in whose favour the disposition was made proves that the disposition was made in the ordinary course of business and that it was not intended to thereby to prefer one creditor over another.*

53.     Section 32 of the SA Insolvency Act ("Section 32") provides:

***Section 32—Proceedings to set aside improper disposition.***

*(1)(a) Proceedings to recover the value of property or a right in terms of section 25(4), to set aside any disposition of property under section 26, 29, 30 or 31,*

16

> *or for the recovery of compensation or a penalty under section 31, may be taken by the trustee.*
>
> (b) *If the trustee fails to take any such proceedings they may be taken by any creditor in the name of the trustee upon his indemnifying the trustee against all costs thereof.*
>
> *(2) In any such proceedings the insolvent may be compelled to give evidence on a subpoena issued on the application of any party to the proceedings or he may be called by the court to give evidence. When giving such evidence he may not refuse to answer any question on the ground that the answer may tend to incriminate him or on the ground that he is to be tried on a criminal charge and may be prejudiced at such a trial by his answer.*
>
> *(3) When the Court sets aside any disposition of property under any of the said sections, it shall declare the trustee entitled to recover any property alienated under the said disposition or in default of such property the value thereof at the date of the disposition or at the date on which the disposition is set aside, whichever is higher.*

54. Each disposition of bitcoin made to Defendant by Debtor within six months before the date of liquidation of the Debtor constitutes a preference by the Debtor of Defendant over its other creditors, which is voidable as contemplated in Section 29 in that:

> (a) Each of the dispositions made by the Debtor to Defendant had the effect of preferring Defendant over the remaining creditors of the Debtor; and
>
> (b) Immediately after each disposition of bitcoin made by the Debtor to Defendant, the Debtor's liabilities exceeded its assets.

55. Accordingly, each disposition of bitcoin to Defendant made within six months of the Debtor's Liquidation, in excess of Defendant's Bitcoin Contribution, should be set aside pursuant to Section 29 of the SA Insolvency Act and recoverable by the Plaintiff pursuant to Section 32(3) of the SA Insolvency Act.

SEQUOR LAW, P.A.

56.    Plaintiff seeks a judgment requiring Defendant to return to the Debtor's estate every disposition of additional bitcoin received from the Debtor made within six months of Debtor's Liquidation, in, at a minimum, the amount reflected in the chart attached hereto as **Exhibit A**.

## COUNT THREE

### RECOVERY OF UNDUE PREFERENCE PURSUANT TO SECTION 30 OF THE SA INSOLVENCY ACT

57.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

58.    Defendant has been identified as a Class 3 Investor who received a Profit disposition from the Debtor.

59.    Section 30 of the SA Insolvency Act ("Section 30") provides:

*Section 30 – Undue preference to creditors*

*(1) If a debtor made a disposition of his property at a time when his liabilities exceeded his assets, with the intention of preferring one of his creditors above another, and his estate is thereafter sequestrated, the court may set aside the disposition.*

*(2) For the purposes of this section and of section twenty-nine a surety for the debtor and a person in a position by law analogous to that of a surety shall be deemed to be creditor of the debtor concerned.*

60.    Section 32 of the SA Insolvency Act ("Section 32") provides:

*Section 32—Proceedings to set aside improper disposition.*

*(1)(a) Proceedings to recover the value of property or a right in terms of section 25(4), to set aside any disposition of property under section 26, 29, 30 or 31, or for the recovery of compensation or a penalty under section 31, may be taken by the trustee.*

*(b) If the trustee fails to take any such proceedings they may be taken by any creditor in the name of the trustee upon his indemnifying the trustee against all costs thereof.*

*(2) In any such proceedings the insolvent may be compelled to give evidence on a subpoena issued on the application of any party to the proceedings or he may be*

18

*called by the court to give evidence. When giving such evidence he may not refuse to answer any question on the ground that the answer may tend to incriminate him or on the ground that he is to be tried on a criminal charge and may be prejudiced at such a trial by his answer.*

*(3) When the Court sets aside any disposition of property under any of the said sections, it shall declare the trustee entitled to recover any property alienated under the said disposition or in default of such property the value thereof at the date of the disposition or at the date on which the disposition is set aside, whichever is higher.*

61.     Each disposition of bitcoin made to Defendant by Debtor constitutes an undue preference by the Debtor of Defendant over its other creditors, as contemplated in Section 30 in that:

    (a) At all relevant times when the dispositions were made by the Debtor to Defendant, the liabilities of the Debtor exceeded its assets;

    (b) Each of the dispositions made by the Debtor to Defendant was made with the intention to prefer Defendant as a creditor over remaining creditors of the Debtor;

    (c) The Debtor was aware that the dispositions were made from the bitcoin Debtor received from MTI Investors in the carrying on of the unlawful business of the Debtor, and through effecting the dispositions to Defendants, Debtor became unable to perform its obligations towards its other creditors; and

    (d) The Debtor was further aware that the dispositions made to the Defendant had the effect of preferring Defendant over the Debtor's remaining creditors.

62.     The Debtor intended, through such dispositions being made to Defendant, to defraud the Debtor's creditors and/or to prefer Defendant over the Debtor's remaining creditors.

63.     The dispositions made to Defendant made by the Debtor to Defendant had the effect of unduly preferring Defendant over the Debtor's other creditors.

64.     Accordingly, each disposition of bitcoin to Defendant in excess of Defendant's Bitcoin Contribution should be set aside pursuant to Section 30 of the SA Insolvency Act and recoverable by the Plaintiff pursuant to Section 32(3) of the SA Insolvency Act.

65.     Plaintiff seeks a judgment requiring Defendant to return to the Debtor's estate every disposition of additional bitcoin received from the Debtor made within six months of Debtor's Liquidation, in, at a minimum, the amount reflected in the chart attached hereto as **Exhibit A**.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter an order:

(a) avoiding and recovering dispositions from the Debtor to Defendant without value in, at a minimum, the amount set forth in **Exhibit A**, pursuant to SA Insolvency Act §§ 26 and 32;

(b) avoiding and recovering preferential transfers to Defendant in, at a minimum, the amount set forth in **Exhibit A**, pursuant to SA Insolvency Act §§ 29, 30 and 32;

(c) finding that Plaintiff is entitled to recover from Defendant reasonable attorneys' fees, expenses, and costs of collection incurred in the prosecution of this Adversary Proceeding; and

(d) granting such other and further relief as the Court deems just and equitable.

Dated: March 26, 2024                    Respectfully submitted,

                                         **SEQUOR LAW, P.A.**
                                         1111 Brickell Avenue, Suite 1250
                                         Miami, Florida 33131
                                         Telephone: (305) 372-8282
                                         Facsimile: (305) 372-8202

                              By:     */s/ Gregory S. Grossman*
                                         Gregory S. Grossman, FBN 896667
                                         ggrossman@sequorlaw.com
                                         Maria Jose Cortesi, FBN 1024946
                                         mcortesi@sequorlaw.com

20

**REDMOND LAW FIRM, LLC**
Christopher J. Redmond
Kansas Bar No. 7307
13220 Metcalf, Suite 310
Overland Park, Kansas 66213
Tel:  (913) 379-1100
Christopher.Redmond@christopherredmond
lawfirm.com

*Admitted Pro Hac Vice*

*Exhibit A*

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 9 | | 10 | | 11 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | SECTION 26 CLAIM | | SECTION 29 CLAIM LESS SECTION 26 | | SECTION 29 CLAIM | | SECTION 30 CLAIM | |
| NO | USER ID | DATE | BTC IN/OUT | BTC AMOUNT | RAND VALUE OF BTC | RUNNING BALANCE | BTC | RAND | BTC | RAND | BTC | RAND | BTC | RAND |
| 1 | 8242236 | 2020/07/01 00:00 | In | 0.07242378 | R11 516.18 | 0.07242378 | | | | | | | | |
| 2 | 3040631 | 2020/07/01 00:00 | In | 0.10754769 | R17 101.27 | 0.17997147 | | | | | | | | |
| 3 | 2628113 | 2020/07/14 00:00 | In | 0.02061392 | R3 213.05 | 0.20058539 | | | | | | | | |
| 4 | 1604108 | 2020/07/14 00:00 | In | 0.02591257 | R4 038.94 | 0.22649796 | | | | | | | | |
| 5 | 8242236 | 2020/07/14 00:00 | In | 0.03302717 | R5 147.88 | 0.25952513 | | | | | | | | |
| 6 | 3040631 | 2020/07/17 00:00 | In | 0.00546209 | R836.97 | 0.26498722 | | | | | | | | |
| 7 | 8242236 | 2020/07/17 00:00 | In | 0.01092419 | R1 673.94 | 0.27591141 | | | | | | | | |
| 8 | 2628113 | 2020/07/17 00:00 | In | 0.09285558 | R14 228.45 | 0.36876699 | | | | | | | | |
| 9 | 7528428 | 2020/07/17 00:00 | In | 1.00000000 | R153 232.00 | 1.36876699 | | | | | | | | |
| 10 | 1604108 | 2020/07/20 00:00 | In | 0.18754591 | R28 868.00 | 1.55631290 | | | | | | | | |
| 11 | 4441462 | 2020/07/22 00:00 | In | 0.02795822 | R4 390.36 | 1.58427112 | | | | | | | | |
| 12 | 28093557 | 2020/07/25 00:00 | In | 0.02528523 | R4 093.02 | 1.60955635 | | | | | | | | |
| 13 | 7528428 | 2020/07/26 20:42 | Out | -1.00000000 | R167 610.00 | 0.60955635 | | | 1.00000000 | R167 610.00 | 1.00000000 | R167 610.00 | 1.00000000 | R167 610.00 |
| 14 | 4441462 | 2020/07/27 00:00 | In | 0.09257741 | R17 288.18 | 0.70213376 | | | | | | | | |
| 15 | 1604108 | 2020/07/27 00:00 | In | 0.18381821 | R34 326.76 | 0.88595197 | | | | | | | | |
| 16 | 8242236 | 2020/07/28 00:00 | In | 0.08896797 | R16 453.74 | 0.97491994 | | | | | | | | |
| 17 | 8242236 | 2020/08/01 00:00 | In | 0.00148328 | R300.14 | 0.97640322 | | | | | | | | |
| 18 | 8242236 | 2020/08/01 00:00 | In | 0.00215721 | R436.50 | 0.97856043 | | | | | | | | |
| 19 | 8242236 | 2020/08/01 00:00 | In | 0.00241912 | R489.50 | 0.98097955 | | | | | | | | |
| 20 | 8242236 | 2020/08/01 00:00 | In | 0.00365696 | R739.97 | 0.98463651 | | | | | | | | |
| 21 | 38353008 | 2020/08/02 00:00 | In | 0.09629148 | R19 883.32 | 1.08092799 | | | | | | | | |
| 22 | 8242236 | 2020/08/03 00:00 | In | 0.17800600 | R35 125.21 | 1.25893399 | | | | | | | | |
| 23 | 8242236 | 2020/08/04 00:00 | In | 0.17645643 | R34 685.86 | 1.43539042 | | | | | | | | |
| 24 | 8242236 | 2020/08/05 00:00 | In | 0.08851124 | R18 077.98 | 1.52390166 | | | | | | | | |
| 25 | 38353008 | 2020/08/05 00:00 | In | 0.17524855 | R35 793.64 | 1.69915021 | | | | | | | | |
| 26 | 3040631 | 2020/08/06 00:00 | In | 0.03822898 | R7 959.81 | 1.73737919 | | | | | | | | |
| 27 | 8242236 | 2020/08/06 00:00 | In | 0.12821592 | R26 696.35 | 1.86559511 | | | | | | | | |
| 28 | 97777440 | 2020/08/10 00:00 | In | 0.00042285 | R90.22 | 1.86601796 | | | | | | | | |
| 29 | 96989180 | 2020/08/16 00:00 | In | 0.16809958 | R34 872.93 | 2.03411754 | | | | | | | | |
| 30 | 96989180 | 2020/08/19 00:00 | In | 0.03058618 | R6 361.19 | 2.06470372 | | | | | | | | |
| 31 | 93770117 | 2020/08/21 00:00 | In | 0.02519157 | R5 163.44 | 2.08989529 | | | | | | | | |
| 32 | 88618182 | 2020/08/21 00:00 | In | 0.04216562 | R8 642.56 | 2.13206091 | | | | | | | | |
| 33 | 98922637 | 2020/08/23 00:00 | In | 0.02146844 | R4 314.58 | 2.15352935 | | | | | | | | |
| 34 | 55965739 | 2020/08/23 00:00 | In | 0.08587376 | R17 258.31 | 2.23940311 | | | | | | | | |
| 35 | 75436725 | 2020/08/24 00:00 | In | 0.00222280 | R446.45 | 2.24162591 | | | | | | | | |
| 36 | 75436725 | 2020/08/24 00:00 | In | 0.02000528 | R4 018.08 | 2.26163119 | | | | | | | | |
| 37 | 96989180 | 2020/08/28 00:00 | In | 0.16809958 | R32 576.02 | 2.42973077 | | | | | | | | |
| 38 | 96989180 | 2020/09/06 00:00 | In | 0.78450831 | R134 826.38 | 3.21423908 | | | | | | | | |
| 39 | 7528428 | 2020/09/16 18:04 | Out | -0.02453768 | R4 438.33 | 3.18970140 | | | 0.02453768 | R4 438.33 | 0.02453768 | R4 438.33 | 0.02453768 | R4 438.33 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 3040631 | 2020/09/20 00:00 | In | 0.08971093 | R16 233.28 | 3.27941233 | | | | | | | | |
| 41 | 3040631 | 2020/09/20 00:00 | In | 0.18244845 | R33 014.23 | 3.46186078 | | | | | | | | |
| 42 | 8242236 | 2020/09/21 12:56 | Out | -0.65516325 | R117 650.94 | 2.80669753 | | | 0.65516325 | R117 650.94 | 0.65516325 | R117 650.94 | 0.65516325 | R117 650.94 |
| 43 | 3040631 | 2020/11/03 12:51 | Out | -0.36955407 | R83 183.30 | 2.43714346 | | | 0.36955407 | R83 183.30 | 0.36955407 | R83 183.30 | 0.36955407 | R83 183.30 |
| 44 | 8242236 | 2020/11/03 14:33 | Out | -0.36959887 | R83 193.38 | 2.06754459 | | | 0.36959887 | R83 193.38 | 0.36959887 | R83 193.38 | 0.36959887 | R83 193.38 |
| 45 | 2628113 | 2020/11/05 00:00 | In | 0.34464932 | R85 229.71 | 2.41219391 | | | | | | | | |
| 46 | 2628113 | 2020/11/05 00:00 | In | 0.37895230 | R93 712.63 | 2.79114621 | | | | | | | | |
| 47 | 2628113 | 2020/11/13 10:32 | Out | -0.76167544 | R196 394.20 | 2.02947077 | | | 0.76167544 | R196 394.20 | 0.76167544 | R196 394.20 | 0.76167544 | R196 394.20 |
| 48 | 3040631 | 2020/11/21 00:00 | In | 0.01038860 | R3 038.96 | 2.03985937 | | | | | | | | |
| 49 | 75436725 | 2020/11/21 00:00 | In | 0.54624482 | R159 791.90 | 2.58610419 | | | | | | | | |
| | | | | | | | | | | | | | | |
| TOTAL: | | | | | | 2.58610419 | 0.00000000 | R0.00 | 3.18052931 | R652 470.15 | 3.18052931 | R652 470.15 | 3.18052931 | R652 470.15 |

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>CHAVONNES BADENHORST ST CLAIR COOPER, in her capacity as the Foreign Representative of Mirror Trading International (PTY) Ltd, | DEFENDANTS<br>NAUDAAN SUACHAII HURH |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>SEQUOR LAW, P.A.<br>1111 Brickell Avenue, Suite 1250, Miami, Florida 33131; Telephone: (305) 372-8282 | ATTORNEYS (If Known) |
| PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       ☒ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       ☒ Other<br>□ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Avoidance and recovery of transfers pursuant to South African law and 11 U.S.C § 1521 (a)(7).

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 41,875.53 |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Mirror Trading International (PTY) Ltd. | BANKRUPTCY CASE NO.<br>23-11046-PDR | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Florida | DIVISION OFFICE<br>Ft. Lauderdale | NAME OF JUDGE<br>Russin |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>03/26/2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Gregory S. Grossman | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.